Filed 8/24/22  Sjobring v. First Am. Title Ins. Co. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JEFFREY ALBERT SJOBRING et al.,<br><br>      Plaintiffs and Appellants,<br><br>      v.<br><br>FIRST AMERICAN TITLE INSURANCE COMPANY et al.,<br><br>      Defendants and Respondents. | B293732<br><br>Los Angeles County<br>Super. Ct. Nos. JCCP4751, BC382826, BC329482 |

APPEALS from judgments of the Superior Court of Los Angeles County, Maren E. Nelson, Judge. Reversed.

The Bernheim Law Firm, Steven J. Bernheim, Nazo S. Semerjian; Shernoff Bidart Echeverria, Michael J. Bidart, Steven M. Schuetze; Friedman Rubin, Richard H. Friedman; The Kick Law Firm and Taras Kick for Plaintiffs and Appellants.

Dentons US, Ronald D. Kent, Joel D. Siegel, Susan M. Walker, Paul M. Kakuske for Defendants and Respondents.

# INTRODUCTION

The Insurance Code requires title insurers and title companies to file a schedule of their rates with the Insurance Commissioner before charging those rates to the public. (Ins. Code, §§ 12401.1, 12401.7, 12414.27.)[1] The Insurance Code also prohibits title insurers and title companies from charging rates for policies and services except in accordance with their filed rates. (§ 12414.27.)

These consolidated appeals concern two class action lawsuits brought against defendants and respondents First American Title Insurance Company and First American Title Company (collectively, defendants). One lawsuit was filed by plaintiff and appellant Jeffrey Albert Sjobring. The other lawsuit was filed by plaintiff and appellant Wendy Kaufman. We refer to Sjobring and Kaufman collectively as plaintiffs. Both plaintiffs obtained policies from defendants to insure the title on a recently purchased home: an owner's policy to cover their own interest in the title, and a loan policy to cover the mortgage-lender's interest. Because title insurance policies like these insure the same property, they are usually less expensive when purchased together. How much less expensive depends on the range of defects they insure against—that is, whether the policies are classified as "standard coverage" or "extended coverage."

Plaintiffs allege they were overcharged for their title insurance policies. Specifically, Sjobring asserts that defendants' filed rate for an extended coverage loan policy when sold together with an extended coverage owner's policy was $125, not the $563

---

[1] Undesignated statutory references are to the Insurance Code.

that he was charged. Alternatively, Sjobring asserts that even if his policy is considered a standard coverage policy, he should have been charged defendants' filed rate of $290. For her part, Kaufman alleges that under defendants' filed rates, there was no charge for a loan policy that was sold concurrently with a standard coverage owner's policy. Thus, Kaufman should have only paid $125, not the $710 that she was charged.

The trial court granted defendants' motions for judgment on the pleadings and dismissed both lawsuits. It concluded that plaintiffs' allegations amounted to an improper challenge to the "use" of a rate and implicates "ratemaking." Accordingly, defendants were shielded from liability under section 12414.26, which bars suits under noninsurance laws for any "act done, action taken, or agreement made pursuant to the authority conferred" by the rate-filing statutes. (§ 12414.26.)

On appeal, plaintiffs contend their claims are not barred by section 12414.26 because the lawsuits do not challenge defendants' ratemaking. Nor do they challenge the amount of any filed rate or coverage classification. Instead, the issue is whether defendants unlawfully collected more than the filed rates. Accordingly, whether plaintiffs' policies are standard or extended coverage policies is not a question about rate setting. It is a question about the nature of the policies, which in turn determines what plaintiffs should have been charged. This is a question of fact. And because the answer to that question is not clear from the face of the pleadings and judicially noticed documents, it cannot be resolved in a motion for judgment on the pleadings.

In a recent opinion, the California Supreme Court held that "[t]he statutory immunity for 'act[s] done … pursuant to the

3

authority conferred' ([§] 12414.26) by the rate-filing statutes does not shield title insurers from suit for charging unauthorized rates, and the Insurance Commissioner does not have exclusive jurisdiction over such claims." (*Villanueva v. Fidelity National Title Co.* (2021) 11 Cal.5th 104, 110–111 (*Villanueva*).) In conformity with *Villanueva,* we conclude that plaintiffs do not challenge defendants' filed rates or coverage classifications and, therefore, section 12414.26 does not shield them from suit for charging unauthorized rates for their title policies. We reverse the judgments and remand for further proceedings.

## PROCEDURAL BACKGROUND

1.    **Certified Classes and the Operative Pleading in the *Sjobring* Lawsuit**

Sjobring filed his operative fourth amended class action complaint in Los Angeles Superior Court case No. BC329482 on November 15, 2010.

The court certified two classes for the fraud, negligent misrepresentation, and unfair competition claims. As to class one,[2] the court certified the following class: "All persons who paid all or part of the premium in a transaction occurring from January 1, 2003 through October 8, 2006, in which the premium paid was more than $125 for any First American concurrent loan policy issued with an Eagle Owner's Policy issued without regional exceptions insuring property in California, where the aggregate liability of the loan policies issued did not exceed the aggregate liability of the owner's policy." The court found a

---

[2] The class certified as class one was labeled class two in Sjobring's fourth amended complaint.

common question existed as to "whether the Eagle Owner's Policy is an extended or standard coverage policy."

As to class two,[3] the court certified the following class: "All persons who paid all or part of the premium in a transaction occurring from January 1, 2003 through October 8, 2007, in which the premium paid was more than 20 percent of 'Base Rate A' for a First American first concurrent loan policy insuring property in California, where the aggregate liability under the loan policies did not exceed the liability under the owner's policy, excepting those persons who are members of any class that may be certified in *Kaufman* … . Class Two may only seek to claim that the rate applied to the lender's policy, as issued, was improper and should have been charged at the lower C-5 rate."

## 2.    Certified Class and the Operative Pleading in the *Kaufman* Lawsuit

Kaufman filed her operative second amended class action complaint in Los Angeles Superior Court case No. BC382826 on November 15, 2010. After demurrer, five causes of action remained: breach of contract (first cause of action), breach of implied covenant of good faith and fair dealing (second cause of action), fraud and deceit (fourth cause of action), unjust enrichment/restitution (fifth cause of action), and violation of the Unfair Competition Law (seventh cause of action).

In their amended answer, defendants raised an affirmative defense of immunity under section 12414.26, in which they alleged that the challenged rates and acts were known to, accepted, and approved by the Department of Insurance. They

---

[3] The class certified as class two was labeled class three in Sjobring's fourth amended complaint.

5

also asserted that a scrivener's error or mistake occurred when the rates were filed. According to defendants, the rate Kaufman claimed would allow her and the certified class to obtain the policies for free, a rate they asserted is inadequate.

In September 2017, a class was certified for the causes of action for breach of contract, breach of implied covenant of good faith and fair dealing, and violation of the Unfair Competition Law as to: "All persons who paid for a first Eagle loan title policy in a residential real estate sales transaction in California that was issued concurrently with an owner's policy during the period October 2, 2006 to October 2, 2007, where the aggregate liability of the loan policies did not exceed the liability of the owner's policy."

The trial court found the following common questions existed:

- Did defendants apply the rate correctly for first concurrent Eagle Loan policyholders during the class period?

- Were defendants permitted to charge an additional premium for a first concurrent Eagle Loan policy during the class period, contrary to defendants' filed rate with the California Department of Insurance (CDI)?

- Did defendants violate section 12414.27 by charging a rate that was not filed with the CDI?

- Was there a scrivener's error in the filed rate by defendants, and if so, what effect, if any, does it have on defendants' liability under the Insurance Code?

6

### 3. Motions for Judgment on the Pleadings and Judicially-Noticed Documents

Defendants moved for judgment on the pleadings in both cases. They argued that section 12414.26 precluded the actions as framed by the pleadings and the class certification motions. As to Kaufman, defendants also argued that the "no charge" rate she identified was the result of a scrivener's error.

Defendants filed requests and supplemental requests for judicial notice in support of their motion. The court granted the requests in part and took judicial notice of the following documents:

- statement of decision in *Kirk v. First American Title Co.*, Los Angeles Superior Court case No. BC372797;

- unpublished appellate opinion in *Kirk v. First American Title Company* (June 22, 2016, B257508) [nonpub. opn.]);

- Sjobring's administrative complaint filed with the Department of Insurance on November 16, 2012, which includes, as an exhibit, the schedule of fees on file when Sjobring's policies were purchased;

- the existence of defendants' correspondence with the Department of Insurance amending its fee schedule, but not the truth of the matters therein;

- Plaintiffs' motions for class certification, including the legal positions and concessions made by Sjobring and Kaufman to secure class certification;

- the court's orders granting class certification.

The court declined to take judicial notice of the remaining exhibits, ruling they were irrelevant to the issues presented by the motion.

The court granted Kaufman's request to take judicial notice in part and took judicial notice of certain legislative history of section 12414.26 and deposition testimony. The court also granted Sjobring's request for judicial notice in part and took judicial notice of the following documents:

- The demurrer to Sjobring's Fourth Amended Complaint, filed November 24, 2010;

- Order overruling in part and sustaining in part the demurrer to Sjobring's Fourth Amended Complaint, filed February 1, 2011;

- Defendants' response to Sjobring's complaint to the Insurance Commissioner, filed on December 21, 2012.

The court declined to take judicial notice of the remaining exhibits, ruling they were irrelevant to the disposition of the motion and thus moot.

Finally, the court took judicial notice that it had granted certification of two classes in *Sjobring* and one class in *Kaufman*. And, on its own motion, the court took judicial notice of the fact that in *Kaufman* plaintiffs sought to exclude evidence and argument offered to show that the Insurance Commissioner "authorized, ratified, approved or permitted the charges at issue." Nevertheless, the court explicitly noted that it "express[ed] no view as to whether the facts support [defendants'] defense."

8

The court granted defendants' motions for judgment on the pleadings. It concluded that "the gravamen of [p]laintiffs' theory in both cases is that the rates were improperly used as to the policies at issue. This amounts to a challenge to the 'use' of a rate and implicates 'ratemaking,' a function that, under the statutory scheme, falls initially to the CDI."

The court explained: "Plaintiffs do not contend that [defendants] charged a rate that was not filed and became effective. Instead, they contend that a different rate should have been charged. [¶] The Court recognizes that there is no published case directly on point as to whether a party alleging rate *ambiguity* may bring a direct action or must challenge the rate under Article 6.5. It is also recognized that there is a factual dispute between the parties as to *whether* [defendants] in fact charged a rate they filed with respect to the policies at issue. However, resolution of that factual issue requires the Court to interpret the policies and the rates. Under the statutory scheme this is the exclusive function of the CDI in the first instance, subject to review by the Court."

In particular, as to Sjobring, the court explained "in asserting that [defendants] used the wrong filed rate and asking the Court to determine that his rate is the correct one, Sjobring asks the Court to determine the proper 'use' of a rate and to engage in rate regulation. This is the function of the CDI, at least initially."

As to Kaufman: "In making these determinations the Court is called upon to determine whether the policy sold to Kaufman was a 'Standard' or 'Extended' policy and to determine what effect, if any, the claimed scrivener's error has on the proper rate to be charged, including whether the rate as posted would be

9

considered inadequate under section 12401.3 and Article 5.5. [Fn. omitted.] Put another way, the parties each ask the Court to determine that her/their position as to the effect of the claimed scrivener's error is correct. [¶] In addition, … [Kaufman] alleges that alternatively, there was another less-expensive pricing structure that could have been applied. [Citation.] In either event, Kaufman's claims implicate the '*making and use*' of a rate under Section 12401.3."

In conclusion, the court held: "*Sjobring* and *Kaufman* as now understood challenge the use of a filed rate and require the Court to engage in rate setting, rate regulation, and a determination of the proper 'use' of rates. As the Court understands the statutory scheme and the case law[,] a civil action on this basis is precluded prior to an action brought under Section 6.5 of the Insurance Code."

The court entered judgments of dismissal from which plaintiffs filed timely notices of appeal.

## CONTENTIONS

Plaintiffs contend that immunity under section 12414.26 is limited to conduct authorized by articles 5.5 and 5.7 of the Insurance Code. Those articles do not authorize title insurers to charge more than their filed rates. To the contrary, such conduct is expressly prohibited by section 12414.27. Whether defendants charged more than the filed rates depends, in turn, on whether plaintiffs' policies provided standard or extended coverage and courts routinely interpret insurance policies. Because those classifications are not clear from the face of the pleadings and judicially noticed documents, it is a question of fact that cannot be resolved by motions for judgment on the pleadings. Plaintiffs also contend that administrative proceedings before the

Insurance Commissioner are not a consumer's exclusive remedy for the charging of an unauthorized rate.

Defendants contend they are immune from suit under section 12414.26 because the lawsuits challenge acts done pursuant to authority conferred by article 5.5—namely, rate setting and the classification of title insurance policies. And *Villanueva* doesn't assist plaintiffs because that case dealt with a title insurer that charged rates without filing them with the Insurance Commissioner. Defendants also argue that article 6.7's administrative process is the sole remedy for claims that fall within section 12414.26's immunity provision.

## DISCUSSION

### 1.    Standard of Review

" 'The standard of review for a motion for judgment on the pleadings is the same as that for a general demurrer: We treat the pleadings as admitting all of the material facts properly pleaded, but not any contentions, deductions or conclusions of fact or law contained therein. ... We review the complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any theory. [Citation.]' [Citation.]" (*Burd v. Barkley Court Reporters, Inc.* (2017) 17 Cal.App.5th 1037, 1042.) We will not, however, credit the allegations in the complaint where they are contradicted by facts that either are subject to judicial notice or are evident from exhibits attached to the pleading. (*Hill v. Roll Internat. Corp.* (2011) 195 Cal.App.4th 1295, 1300.) We review de novo whether a cause of action has been stated as a matter of law. (*Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 125.) We do not review the validity of the trial court's

11

reasoning, however, and will affirm its ruling if it was correct on any theory. (*Hill*, at p. 1300.)

The scope of the immunity provision in section 12414.26 is a matter of statutory interpretation that we consider de novo. (See *People v. Prunty* (2015) 62 Cal.4th 59, 71.) As with any case involving statutory interpretation, our primary goal is to ascertain and effectuate the lawmakers' intent. (*Villanueva, supra*, 11 Cal.5th at p. 114.) To determine intent, we first examine the statutory language and give the words their ordinary meaning. (*Ibid.*) If the statutory language is unambiguous, its plain meaning controls. (*Mays v. City of Los Angeles* (2008) 43 Cal.4th 313, 321.)

### 2. Title Insurance Regulation

A "rate" is "the charge or charges … made to the public by a title insurer, an underwritten title company or a controlled escrow company, for all services it performs in transacting the business of title insurance." (§ 12340.7.) "The Insurance Code requires all title insurers to file a schedule of their rates with the Commissioner. (Ins. Code, § 12401.1.) … Once rates are filed, regulated entities are required to wait 30 days before using them. (Ins. Code, §§ 12401.1, 12401.7.) This regulatory approach— commonly known as 'file and use'—allows entities to implement their filed rates without the need for formal prior approval. [Citations.]" (*Villanueva, supra*, 11 Cal.5th at p. 113.) Title insurers may not charge more than their filed rates. (§ 12414.27 [title insurers may only charge "in accordance with rate filings which have become effective pursuant to Article 5.5"].)

As relevant here, article 5.5 (§§ 12401–12401.10) "governs title insurance rate filing and regulation. Among other things, article 5.5 requires title insurers to 'establish basic classifications

12

of coverages and services' as a basis for their rates (Ins. Code, § 12401.2; see *id*., § 12401.3, subd. (d)) and to then file those rates with the Commissioner (*id*., § 12401.1). The article forbids rates that are excessive, inadequate, or discriminatory. (*Id*., § 12401.3, subd. (a).) It generally prohibits title insurers from charging unfiled rates or rates before their effective date, 30 days after filing. (*Id*., §§ 12401.1, 12401.7; see *id*., §§ 12401.71, 12401.8 [specifying exceptions].) In addition, article 5.5 permits insurers to consult with each other and with industry organizations and share information and loss experience data (*id*., § 12401.4), data that is central to the insurers' ability to set rates [citation]. Finally, the article permits entities under the same management to act in concert. (Ins. Code, § 12401.6.)" (*Villanueva*, *supra*, 11 Cal.5th at p. 115.) Article 5.7 regulates insurance advisory organizations, through which "insurers may obtain a much deeper pool of loss experience data than they would otherwise have at their disposal." (*Ibid*.)

Section 12414.26, in turn, affords title insurers some level of immunity from challenges to actions they take under this scheme. The statute provides: "No act done, action taken, or agreement made pursuant to the authority conferred by Article 5.5 (commencing with Section 12401) or Article 5.7 (commencing with Section 12402) of this chapter shall constitute a violation of or grounds for prosecution or civil proceedings under any other law of this state heretofore or hereafter enacted which does not specifically refer to insurance."

Recently, in *Villanueva*, *supra*, 11 Cal.5th at pp. 117–118, the California Supreme Court rejected a title company's expansive view of its immunity from suit under section 12414.26. Although *Villanueva* does not expressly define the scope of

13

section 12414.26 immunity, the opinion makes clear that even at its broadest, immunity does not extend beyond conduct *authorized* by articles 5.5 and 5.7. (*Villanueva*, at pp. 115–117.)

In *Villanueva*, the plaintiff and his wife had refinanced the mortgage on their home, with Fidelity National Title Company (Fidelity) providing escrow services. (*Villanueva*, *supra*, 11 Cal.5th at p. 111.) For its services, Fidelity charged the couple an escrow fee, an overnight delivery fee, a courier fee, and a fee for preparing a new deed. (*Ibid*.) Villanueva later sued Fidelity, asserting that the delivery, courier, and draw deed fees were illegal because they had never been filed with the Insurance Commissioner. (*Ibid*.)

The court granted the motion for class certification, and, following a bench trial, determined that "Fidelity was required to file its rates with the Commissioner, that document delivery was a service for which a rate filing was required, and that Fidelity had not filed its delivery service rate. The court further determined that, for the first two years of the class period, Fidelity had no rate on file for drawing deeds or document preparation, and thus during that period, the fee for drawing up a deed was also illegal." (*Villanueva*, *supra*, 11 Cal.5th at p. 111.)

The court of appeal reversed in part and ordered the trial court to dismiss the suit. (*Villanueva*, *supra*, 11 Cal.5th at p. 112.) It concluded that the class claims were barred. First, Fidelity was immune from suit under section 12414.26 because the statute extends to all " ' "ratemaking-related activities," ' a category that includes the charging of unfiled rates. [Citations.] Second, the court held that the statutory scheme affords consumers charged unfiled rates only one avenue of redress: an administrative complaint submitted to the Commissioner … ."

14

(*Villanueva*, at p. 112.) The Supreme Court granted review on both questions.

The issue, as framed by the Supreme Court, was "whether, if a title insurer charges rates without filing them, a consumer can challenge the charges as unlawful in court." (*Villanueva*, *supra*, 11 Cal.5th at p. 110.) Fidelity argued the answer was no. (*Id*. at p. 114.) First, Fidelity claimed section 12414.26 immunizes ratemaking from civil suit under noninsurance laws. Second, it argued that under other provisions of the Insurance Code, unfiled-rate claims are within the exclusive jurisdiction of the Insurance Commissioner. (*Ibid*.) *Villanueva* rejected both arguments. (*Id*. at pp. 114–126 [rejecting immunity argument], 126–133 [rejecting jurisdiction argument].)

As to section 12414.26, *Villanueva* held that immunity "does not extend to the charging of unfiled rates because [articles 5.5 and 5.7] confer no such authority; on the contrary, the referenced articles expressly prohibit the charging of unfiled rates." (*Villanueva, supra*, 11 Cal.5th at p. 117.) Instead, section 12414.26 is "best understood as an effort to reconcile the tension between what is explicitly allowed by articles 5.5 (Ins. Code, § 12401 et seq.) and 5.7 (Ins. Code, § 12402 et seq.) and what is potentially disallowed by other noninsurance statutes, most prominently the Cartwright Act and other antitrust acts. It creates a safe harbor for actions authorized by articles 5.5 and 5.7 and harmonizes title insurance law with background state laws governing business competition and other matters. The [legislative] history offers no hint that either section 12414.26 or its predecessor immunity provisions were ever thought to categorically immunize all ratemaking activity— even unauthorized activity—from suit." (*Villanueva*, at pp. 121–

122.) In short, the Supreme Court held that immunity does not extend beyond activity authorized by articles 5.5 and 5.7.[4]

As for the scope of that authorization, *Villanueva* explains that article 5.5 "contemplates that title insurers may: (1) charge a filed rate after its effective date (Ins. Code, §§ 12401.1, 12401.7); (2) charge a filed rate before its effective date if the new rate results in a rate reduction (*id.*, § 12401.71, subd. (a)); and (3) for unusual risks or services, impose surcharges in excess of those set forth in the rate filing, provided the surcharges are reasonable and approved in writing in advance (*id.*, § 12401.8). Setting aside 'miscellaneous charges' (*id.*, § 12340.7), the imposition of any charge that does not fit within these categories would not be authorized by article 5.5." (*Villanueva, supra*, 11 Cal.5th at p. 115.) Thus, in the matter before it, the court concluded: "The rates charged here, which were never filed with the Commissioner, do not fall into any of these categories. Far from being authorized, they are expressly prohibited. (See Ins. Code, §§ 12401.1, 12401.7, 12414.27.)" (*Id.* at pp. 115–116.)

### 3.    Types of Title Insurance

Title insurance policies fall into two broad types. An "owner" policy covers the buyer's interest in real property. A "loan" or "lender" policy covers a mortgage lender's interest in the same property, in the title, and in its lien position.[5] The policies

---

[4] In light of our holding that section 12414.26 does not shield defendants from plaintiffs' claims, we need not and do not decide the question the Supreme Court left open: whether section 12414.26 immunity is limited to antitrust liability for concerted actions. (See *Villanueva, supra*, 11 Cal.5th at pp. 117–123.)

[5] We use "loan policy" and "lender policy" interchangeably.

are usually issued concurrently when a lender finances part of the purchase price. Typically, the property buyer pays for a loan policy to cover the mortgage lender. The owner policy may be paid for by the buyer, the seller, or both, depending on the terms of the sale agreement. In general, because it covers the same property, a lender's policy is cheaper when bundled with an owner's policy—but how much cheaper depends on the type of coverage.[6]

There are two basic forms of title insurance policies available in California: California Land Title Association (CLTA) policies and American Land Title Association (ALTA) policies. The policies are priced based on whether they provide "standard" or "extended" coverage. Defendants classify all CLTA policies and some ALTA policies as standard coverage. Other ALTA policies can be either standard or extended coverage depending on whether they are issued with regional exceptions (standard) or without regional exceptions (extended).[7]

Defendants also offer a policy called the EAGLE Owner's Policy, which is a trade name for the CLTA/ALTA Homeowner's Policy. The CLTA/ALTA Homeowner's Policy, available to purchasers of owner-occupied family residences of up to four

---

[6] According to Kaufman's complaint, the owner's title policy is issued for the purchase price, and the loan policy for the amount of the loan. Although the total amount of insurance sold under the two policies thus exceeds the purchase price, insurance companies are not usually liable for more than the value of the property, which is typically the purchase price at the time of the sale. Thus, a concurrent loan policy whose liability amount does not exceed the amount of the owner's policy does not increase the risk for the insurer.

[7] "Regional exceptions" refers to a subset of exceptions from coverage. Examples include easements not shown by public records.

units, provides simplified policy language and coverage for risks not included in standard policies. (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2021) ¶ 6:2630.)

**4.      Title Policies at Issue**

As we discuss below, because the nature of an owner's policy—that is, whether it is a standard coverage policy or an extended coverage policy—determines the price defendants charged for a concurrently-issued lender's policy, the fundamental issue in these class actions is whether certain owners' policies issued by defendants were standard or extended coverage policies. Defendants contend their policy classifications are intrinsic to their filed rates; filed rates are immune from challenge under section 12414.26; interpreting the nature of the policies could result in a challenge to their rates; therefore, their policy classifications are also immune from challenge. For their part, plaintiffs argue defendants read the immunity statute too broadly, and the nature of the policy is a question of fact. They seek to understand the classifications, not attack them. That is, plaintiffs argue we may look at the filed rates and see if defendants complied with them.

**4.1.   Sjobring**

During the Sjobring class period, the cost of an extended coverage lender's policy, when purchased with a *standard* coverage owner's policy, was 30 percent of Base Rate A plus $125. Yet when the same policy was purchased with an *extended* coverage owner's policy, the charge was a flat $125.

The EAGLE Owner's Policy was not defined as either standard or extended coverage in the schedule of fees filed with

18

the Insurance Commissioner.[8] But according to Sjobring's complaint, it was addressed in a different, dedicated fee summary provided to the public. The summary defines the EAGLE policy as: "An expanded title policy for owners and lenders on one-to-four family residences, including condominiums. It includes additional protection and is the best overall coverage available today." The publication also describes it as "an extended coverage owner's policy which includes coverage for certain future risks … ."

In 2004, Sjobring purchased a home from Patrick Kirk for $650,000. Defendants issued an EAGLE Owner's Policy without regional exceptions and policy limits of $650,000, paid for by Kirk. They charged Kirk $1,648, the amount listed in the EAGLE policy fee summary.[9] At the same time, defendants issued a 1992 ALTA Loan Policy without regional exceptions and policy limits of $441,000, paid for by Sjobring, to cover the mortgage lender. Defendants' filed fee schedule classified the ALTA Loan Policy as an extended coverage policy. They charged Sjobring $563 for this policy.

For class one, Sjobring contends that his EAGLE Owner's Policy was an extended coverage policy. Because his lender's policy also provided extended coverage, he argues he should have been charged $125 rather than $563. Defendants claim that the owner's policy was a standard coverage policy, and as such,

---

[8] Nor does the filed fee schedule define the CLTA/ALTA Homeowner's Policy as either standard or extended coverage.

[9] The Kirk transaction is the subject of a different lawsuit. As noted, the court below took judicial notice of the appellate opinion in that case, *Kirk v. First American Title Company*, *supra*, B257508.

19

Sjobring was charged the correct amount. Because Sjobring was charged the filed rate, defendants contend they are immune from suit under section 12414.26.

For class two, Sjobring contends that if his owner's policy is a standard, rather than extended, coverage policy, he was still overcharged. In that case, he argues, the lender's policy was not *full* extended coverage but *partial* extended coverage.

Partial extended coverage takes a standard coverage policy and removes some, but not all, of the regional exceptions. The total charge for such a policy depends on which regional exceptions are deleted, but the maximum charge is 20 percent of Base Rate A. This is less than the formula for an extended coverage lender's policy issued alongside a standard coverage owner's policy: 30 percent of Base Rate A + $125. Sjobring alleges that although the partial-extended-coverage rate appears in the fee schedule submitted to the Insurance Commissioner, it does not appear in the fee summaries provided to the public. He also alleges that this rate was available to him, and, had defendants applied it, he would have been charged only $290 rather than $563.

### 4.2. Kaufman

By the time Kaufman bought her house, defendants had modified their fee schedule. The rates for *extended* coverage loan policies remained the same as for Sjobring: 30 percent of Base Rate A plus $125 when sold with a standard owner's policy but a flat $125 when sold with an extended owner's policy. But for *standard* coverage loan policies sold alongside an owner's policy of any type, the filing stated that "there shall be no charge for" the policy. The fee schedule had also been amended to define

standard coverage to include the EAGLE Owner's Policy and EAGLE Loan Policy.[10]

In December 2006, Kaufman purchased a Simi Valley home. Defendants issued an EAGLE Owner's Policy with limits of $774,000 and an EAGLE Loan Policy with limits of $580,000. Kaufman paid for both policies: $1,284.25 for the owner's policy and $710 for the lender policy.

Kaufman contends that both policies are defined in the fee schedule as standard coverage policies. As such, instead of paying $710 for the lender policy, she should have received it for no additional charge.

Alternatively, Kaufman argues that under defendants' rate filing, there was a less expensive pricing structure available for both her owner's and loan policies, found in Section E of the rate schedule.[11] She contends she should have been charged these lower rates.

Defendants assert that Kaufman's entire case is based on a scrivener's error contained in the fee schedule filed in October 2006, in which they erroneously listed the EAGLE Loan Policy as standard rather than extended coverage. They do not separately address her alternative contention about Section E.

---

[10] As discussed, when Sjobring bought his house, the fee schedule's list of standard and extended policies did not mention EAGLE policies.

[11] This section of the rate schedule was neither attached to the complaint nor among the documents judicially noticed by the court below. According to the Kaufman complaint, the Department of Insurance does not publish the fee schedules filed by title insurers.

## 5.     Plaintiffs do not challenge acts authorized by section 12414.26.

As discussed, section 12414.26 states: "No act done, action taken, or agreement made pursuant to the authority conferred by Article 5.5 (commencing with Section 12401) or Article 5.7 (commencing with Section 12402) of this chapter shall constitute a violation of or grounds for prosecution or civil proceedings under any other law of this state heretofore or hereafter enacted which does not specifically refer to insurance."

*Villanueva* held that to the extent the statute immunizes conduct other than concerted action, it applies only to activity *authorized* by articles 5.5 and 5.7. (*Villanueva, supra,* 11 Cal.5th at pp. 115–116.) As relevant here, article 5.5 provides that insurers may charge a filed rate after its effective date. (§§ 12401.1, 12401.7; *Villanueva,* at p. 115.) It does not authorize insurers to charge more than the filed rate or to charge rates they have not filed.

Defendants argue that *Villanueva* is inapplicable to our facts because it addressed a situation in which rates for the charged fees had not been filed at all. For example, in *Villanueva,* defendant Fidelity was charging its customers a "delivery service fee" but did not have a charge called "delivery service fee" on file with the Insurance Commissioner. (*Villanueva, supra,* 11 Cal.5th at p. 111.) Because a title insurer cannot charge a fee before filing it with the Commissioner, Fidelity's actions were not authorized under the statute. And because its actions were unauthorized, Fidelity was not immune from suit under section 12414.26. (*Villanueva,* at pp. 115–116.) *Villanueva*'s holding, however, was not limited to situations involving unfiled rates for certain fees— it broadly and expressly held that section 12414.26's immunity

22

"does not shield title insurers from suit for charging unauthorized rates[.]" (*Villanueva*, at p. 111.) Indeed, the court emphasized that the legislative history "offers no hint that either section 12414.26 or its predecessor immunity provisions were ever thought to categorically immunize all ratemaking activity—even unauthorized activity—from suit." (*Id.* at p. 122.)

Defendants also assert that article 5.5 allows them to set and file rates, then charge those rates after 30 days. They did so. As such, defendants argue they are immune from plaintiffs' challenge to their "making and use of [their] filed rates, including these coverage classifications (i.e., 'Standard' vs. 'Extended' coverage title policies) … ." Plaintiffs, they claim, are asking us to remake their coverage classifications and filed rates by reinterpreting them.

Defendants' argument rests on the premise that they, in fact, classified plaintiffs' policies the way defendants claim. First, as to Sjobring, they contend they classified his owner's policy as standard coverage, and he is seeking to *reclassify* it as extended coverage. But that is not Sjobring's argument. He does not assert that defendants misclassified the policy; he contends that the policy was always classified as extended coverage, and they charged him for the wrong thing.

Second, as to Kaufman, and discussed in more detail below, defendants assume that her owner's policy was classified as extended coverage in the filed rate schedule and contend that Kaufman wants to *reclassify* it as a standard policy. But that is not Kaufman's argument. Her argument is that the fee schedule itself—the schedule defendants prepared and filed—classifies the policy as a standard policy. She seeks only to hold defendants to their filing.

23

Further, it is not at all clear from the pleadings and the judicially noticed documents that defendants classified the policies the way that they claim. As to Sjobring, the fee schedule does not state whether the EAGLE Owner's Policy is either standard or extended. Nor does it classify the underlying policy—the CLTA/ALTA Homeowner's Policy—as either standard or extended. As such, it is an open question whether defendants filed a rate for that policy at all—but if they did, it is not clear what the rate was or was supposed to be. And by the time Kaufman bought her EAGLE Owner's Policy under the revised rate schedule, the filing did mention the policy—but classified it as a standard policy. Kaufman seeks to hold defendants to that classification.[12]

More importantly, there is a difference between challenging a filed rate with the Insurance Commissioner and challenging the amount charged to an individual consumer for a particular policy by contending that the rate charged to the individual exceeded the filed rate. These lawsuits do not challenge defendants' act of filing any rate with the Commissioner. Nor do they challenge the amount of any filed rate. Instead, they contend that defendants unlawfully charged plaintiffs *more* than the filed rates. And determining whether the underlying policies are standard or extended coverage policies does not involve rate setting; the determination involves questions about the nature of the policies, which in turn establishes what should have been charged.

Defendants also suggest that it is irrelevant whether the amounts they ultimately charged for various policies were for the amounts listed for those policies in the schedule of fees because

---

[12] We discuss the effect of the claimed scrivener's error *post*.

only they get to decide whether a policy is a standard or extended coverage policy. We disagree. *Villanueva* provided the following example, which is illustrative here: "Consider, for example, the case of an insurer that deviates from its filed rates to impose higher rates for African–Americans seeking title insurance for home purchases in particular neighborhoods. Such a policy would surely relate to ratemaking: The insurer effectively has two rate schedules, one for African–Americans and another for those of other races. Such a policy would also be clearly illegal—not only under general antidiscrimination laws like the Unruh Civil Rights Act [citation] and the California Fair Employment and Housing Act [citation], but also under article 5.5 itself. [Citations.]" (*Villanueva, supra*, 11 Cal.5th at p. 124.) In this example, the insurer has rates *on file* but is not actually *charging* the filed rates. That conduct is not authorized by the statute. Thus, the insurer is not immune from suit. Under defendants' argument, however, the fact that the insurer is not charging the filed rates would be irrelevant because courts could not even consider the question.

We also note that plaintiffs' claims do not rest on the premise that defendants violated any statute contained in article 5.5 or article 5.7. Instead, plaintiffs argue defendants violated section 12414.27, which prohibits a title insurance company from charging something other than the rate already on file.[13] Section 12414.27 is found in article 6.9. Because

---

[13] Section 12414.27 provides: "no title insurer, underwritten title company or controlled escrow company shall charge for any title policy or service in connection with the business of title insurance, except in accordance with rate filings which have become effective pursuant to

section 12414.26 applies only to statutes found in articles 5.5 and 5.7, plaintiffs' challenge is outside the scope of the immunity statute. And because section 12414.26 does not shield defendants from suit for charging unauthorized rates, we need not distinguish between statutory and common law claims. Our analysis applies to both.

**6.     Whether defendants charged Kaufman the correct rate and whether they committed a scrivener's error are disputed factual issues.**

As we explained before, Kaufman purchased an EAGLE Loan Policy alongside her EAGLE Owner's Policy. The fee schedule classified that policy as a standard coverage policy. And, according to the fee schedule, "there shall be no charge for" a standard coverage loan policy when purchased with an owner's policy of any type. Instead of providing the loan policy at no additional charge, however, defendants charged Kaufman $710. Accordingly, defendants did not charge their filed rate for the policy, and, under *Villanueva* and section 12414.27, the rate was unauthorized. Because defendants charged Kaufman an unauthorized rate, section 12414.26 does not shield defendants from Kaufman's lawsuit.

Defendants' argument to the contrary—that they in fact charged Kaufman their filed rate—rests on the premise that the loan policy was an extended coverage policy, and they committed a scrivener's error when they classified the policy as standard coverage. Neither the complaint nor the judicially noticed facts establish this premise, however.

---

Article 5.5 (commencing with Section 12401) of this chapter or as otherwise authorized by such article … ."

26

In general, a motion for judgment on the pleadings will only be granted based on affirmative defenses where the face of the complaint and matters judicially noticed disclose that the action is necessarily barred by the defense. (Cf. *Stella v. Asset Management Consultants, Inc.* (2017) 8 Cal.App.5th 181, 191 [discussing demurrers].) Defendants have not made that showing. Indeed, although defendants point to correspondence with the Department of Insurance purporting to establish the scrivener's error—and the court took judicial notice that correspondence was exchanged on the topic—the court did *not* take judicial notice of the truth of the matters in the correspondence. Thus, the allegations in the pleading and the judicially noticed matters did not show that there was a scrivener's error in the relevant rate filing. And to the extent defendants suggest that Kaufman has conceded there was a scrivener's error, their failure to develop that argument has forfeited the issue. (See, e.g., *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 [failure to develop claim with reasoned legal argument and supporting authority forfeits the issue].)

### 7. The Insurance Commissioner does not have exclusive jurisdiction over this matter.

Finally, defendants contend that the administrative process in article 6.7 (§§ 12414.13–12414.19) is the sole remedy for claims that fall within section 12414.26's immunity provision. We disagree. First, as discussed, the claims in this case do not fall within section 12414.26's immunity provision—at least not at this stage of proceedings. Second, *Villanueva* squarely rejected this argument. (*Villanueva, supra*, 11 Cal.5th at pp. 126–133; see *id.* at p. 126 ["we agree … that administrative proceedings are

27

not a ratepayer's exclusive remedy for the charging of an unfiled rate"].)

As *Villanueva* explains: "Article 6.7 (Ins. Code, §§ 12414.13–12414.19) of the chapter covering title insurance provides for administrative proceedings before the Commissioner in the event of disputes over charged rates or rating plans or systems. First, a 'person aggrieved by any rate charged ... by a title insurer ... may request such person or entity to review the manner in which the rate, plan, system, or rule has been applied with respect to insurance or services afforded him. Such request ... shall be written.' (*Id.*, § 12414.13.) If unable to obtain satisfaction from the insurer, the aggrieved consumer may then turn to the Commissioner: 'Any person aggrieved by the action of any such person or entity in refusing the review requested, or in failing or refusing to grant all or part of the relief requested, may file a written complaint and request for hearing with the commissioner, specifying the grounds relied upon.' (*Ibid.*) Under this provision, a written complaint to the regulated entity is a necessary prerequisite to a written complaint to the Commissioner; it is only if the written complaint fails that a person is 'aggrieved' and entitled to seek a hearing with the Commissioner. (*Ibid.*) But nothing in either Insurance Code section 12414.13 or the remainder of article 6.7 suggests that a complaint to the Commissioner is exclusive of any other remedy that might be available to the consumer, including remedies otherwise available in judicial proceedings." (*Villanueva, supra*, 11 Cal.5th at p. 127.)

*Villanueva* reasoned that comparable statutes "show[ ] that the Legislature knows how to prescribe exclusivity when it so intends. The Legislature used no comparable language here. In

describing a consumer's right to file a complaint with the Commissioner, the Legislature used the permissive 'may' rather than the mandatory 'shall.' (See Ins. Code, § 16 [governing interpretation of the two terms].) And the Legislature included no other language expressly making proceedings before the Commissioner the exclusive avenue of recourse. In the absence of such language, we infer the Legislature did not intend such a result." (*Villanueva, supra*, 11 Cal.5th at p. 128.)

Furthermore, as in *Villanueva,* the parties here seek "restitution on a classwide basis, but … the statutory scheme grants the Commissioner no power to issue restitution to aggrieved individual consumers, never mind a class of them. The only relief the Commissioner can provide is an order prohibiting the unlawful rate or suspending or revoking the insurer's license. [Citations.] To interpret article 6.7 as supplying consumers' sole avenue of recourse would leave them unable to obtain restitution of, or have the insurer disgorge, illegal overcharges. It would, as the Commissioner argues, undermine the stated overarching goal of ensuring that insurers do not impose excessive or unfairly discriminatory rates. (Ins. Code, § 12401.) In some cases where a violation is too minor to warrant a license suspension, exclusivity would eliminate any effective deterrent, and in other cases where a suspension is imposed, the absence of restitution would render any remedy incomplete. For this reason, the Commissioner in his briefing urges that 'private enforcement is an important complement to the Department[ of Insurance]'s jurisdiction and consumer protection mission.' " (*Villanueva, supra*, 11 Cal.5th at p. 129; see *id*. at pp. 129–133 [rejecting additional arguments].)

In sum, *Villanueva* is clear on this point, and we are bound by its holding.

## DISPOSITION

The judgments are reversed and the matter is remanded for further proceedings consistent with the views expressed in this opinion. Plaintiffs and appellants Jeffrey Albert Sjobring and Wendy Kaufman shall recover their costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

LAVIN, Acting P. J.

WE CONCUR:

EGERTON, J.

ADAMS, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

30